**Y. W. KIMBRO dba Kimbro Brothers, Appellant,**

**v.**

**ROBERTSON TANK LINES, INC., et al., Appellees.**

No. 11429.

Court of Civil Appeals of Texas.

Austin.

Oct. 19, 1966.

William G. Washington and Ulmer W. Spinney, Austin, for appellant.

Gardere, Porter & DeHay, Gordon H. Rowe, Jr., Dallas, for appellees.

ARCHER, Chief Justice.

This appeal involves determination of a venue question. Appellant herein was impleaded as third party defendant by appellees, who were sued by plaintiff below, Cecil Eugene Abernathy, not a party to this appeal. Abernathy by his original suit filed in Bell County sought to recover damages against appellees for injuries allegedly received when as a pedestrian he was struck on a public highway in Bell County by a truck owned by appellee, Robertson Transport Company, and being driven at the time by appellee, Virgil F. Baird. Appellees, by way of third party complaint, impleaded appellant Y. W. Kimbro, d/b/a Kimbro Brothers, alleging that any injuries which might have been sustained by Abernathy were proximately caused by various acts of negligence on the part of one of appellant's employees acting within the scope of his employment while spreading lime on the premises immediately adjoining the highway where the accident occurred. To this third party complaint, appellant filed his plea of privilege to be sued in Williamson County, Texas, the county of his residence. Said plea of privilege was timely controverted by appellees, who alleged that exceptions to exclusive venue did exist under the provisions of Section 9a of Article 1995, Vernon's Ann.Civ.St., as well as other sections of that Article. A venue hearing was duly held at which time the various depositions appearing as the Statement of Facts herein were introduced for consideration by the trial court. Upon consideration of them, the trial court entered an order overruling appellant's plea of privilege and fixing venue in Bell County, Texas, where the accident made the basis of the lawsuit occurred.

The appeal is based on six points, the first four are that there was no evidence or the evidence was insufficient to prove that appellant was guilty of any negligence on the occasion, or that any such negligence was a proximate cause of the injuries sustained by the original plaintiff.

Appellees assert that appellant's points of error are legally insufficient to present any error for consideration on appeal because such are couched in such general terms that particular grounds are not clearly identified, and cites T.R.C.P. Rules 418, 320 and 321.

Since we believe that the action of the trial court was correct and are affirming the judgment we do not see any need to consider such objection further but do observe that the rules should be complied with. Rosenfield v. Hull, Tex.Civ.App., 304 S.W.2d 571; Red Fish Boat Company v. Jarvis Press, Inc., Tex.Civ.App., 361 S.W.2d 588.

There was adduced before the Court sufficient evidence at the venue hearing to support the trial court's implied finding in favor of appellees within the meaning of Section 9a, Art. 1995, V.A.C.S., that appellant's

employee acting within the scope of his employment committed acts of negligence in Bell County, Texas, proximately causing injuries directly to plaintiff Abernathy which in turn gave rise to appellees' suit herein for contribution.

Appellee Baird testified that as he approached along the road the lime dust at first did not present any problem to visibility, but that when he came abreast of appellant's lime truck, he was suddenly and unexpectedly confronted with a large dispersal of lime from the truck which did obscure visibility, and that he took his foot off the throttle, but was afraid to apply his brakes immediately because there was a passenger car following just behind his truck.

By his deposition Baird testified on pages 55–56:

"Q  In what direction did you maintain your vision?

A  Straight ahead.

Q  And directed where straight ahead?

A  Down the road.

Q  Down the road?

A  Yes.

Q  All right. How long would you say that lime truck was?

A  Well, he wouldn't have been over fifty feet.

Q  Was he as long or longer than you?

A  I would say we were both about the same length.

Q  You were about the same length?

A  Yes, sir.

Q  Was the lime coming out the back or front of his vehicle?

A  Coming out of the back of his trailer.

Q  Could you see how it was coming out? Was it coming out all on the right side, or all on the left side, or all up and down the back of the truck?

A  Well, I couldn't tell.

Q  You weren't particularly paying any attention to him?

A  Well, I wasn't particularly interested.

Q  All right. Was the lime blowing across the roadway in front of you?

A  There was a mist, yes, sir.

Q  How thick was that mist?

A  Well, it wasn't bad until I got right there at the truck.

Q  Until you got to the rear of the truck?

A  Yes, sir.

Q  How far from the rear of the truck?

A  Just right on it.

Q  All right. You kinda underestimated it, I guess?

A  No. I was just right at the truck whenever it got real heavy.

\*    \*    \*    \*    \*    \*

Q  When you first saw the lime truck was it kicking up a lot of dust or just a little bit?

A  Well, it wasn't very bad when I first seen it; and as I come on down the road, it still wasn't very bad.

Q  And by not very bad, do you mean that you could see through it completely?

A  Yes, sir."

On pages 89–90 Baird testified:

"Q  All right, sir, you had your eyes straight on down the road?

A  I was watching the road, yes, sir.

Q  And at that time, you could see pretty far on down the road, could you not, sir?

A  Not at the time I hit him, no, sir.

Q  How far could you see down the road?

A  Well, I had just suddenly run into a mass of that lime, and I couldn't see anywhere.

Q  Just suddenly there was a mass of lime?

A  Yes, sir.

Q  Can you account for that in some way?

A  No, sir. I don't know nothing about that.

Q  There wasn't that much lime as you approached them?

A  No, sir.

Q  The lime that you did see was real sudden?

A  Yes, sir."

Continuing from pages 91–92 of his deposition Baird testified:

"Q  * * * You knew that you were on the paved portion?

A  Yes, I knew I was on the paved portion?

Q  And you never did go off the paved portion.

A  No, sir.

Q  And at that time, though, you weren't in the process of either increasing or decreasing your speed?

A  I had done got off my throttle whenever I hit Mr. Abernathy.

Q  You did what?

A  I had done gotten off the throttle * * * when I hit him. When I got into that sudden mist, I got off of it.

Q  Did you take your foot off the throttle?

A  Yes, sir.

Q  And how long before that, before you hit him?

A  Well, I wouldn't say. Just as soon as I hit it, I got off of it—where I got to where I couldn't see.

Q  Did you put your foot on the brake?

A  No, sir.

Q  Did you feel that you could see far enough ahead where you could stop in that distance?

A  Well, I don't know whether I even gave that a thought or not.

Q  Well, is that the reason you didn't put your foot on the brake, that you did feel you could see far enough head where you could stop?

A  I had a man behind me, I thought, in a car."

Testifying by oral deposition Gumersindo Navarrete, the driver of the lime truck belonging to appellant, stated:

"Q  Now, the complete operation of spreading is handled by the operator of the truck whoever is driving the truck; isn't that right?

A  Yes, we are supposed to unload.

Q  And you are supposed to unload it?

A  Yes.

Q  And the entire job of unloading was under your control on your particular truck? I mean there wasn't anybody from McKinney sitting in your truck operating the unloading?

A  Oh, no. It was me.

Q  You were doing it yourself?

A  Yes.

Q  And at that time you were doing it for Mr. Kimbro who paid you for that work; is that right?

A  Yes.

Q The only thing that McKinney and them had done was to tell you where they wanted it spread?

A Yes.

Q Then it was up to you to do all the the spreading; is that right?

A Yes."

Continuing the witness stated:

"Q Usually, but what I am talking about is, can you spread more at one time and less at one time by the way you operate the switches or something inside the truck?

A Well, you can run up your pressure more, you know.

Q What is the most pressure that you can use?

A 10 pounds.

Q 10 pounds?

A Yes.

Q In other words, if it goes up to 10 pounds, you are going to put out more lime than if you have it less than that; is that correct?

A Yes, sir.

Q And the actual operation of the spreading with reference to whether you are operating it at 10 pounds or 8 pounds is controlled by you as you go along; is that right?

A Well, I still ain't getting what you mean by that.

Q Well, I mean if you have 10 pounds of pressure, you are going to spread more at one time as you go along each foot?

A Yes.

Q And whether or not you've got 10 pounds of pressure or 8 pounds of pressure, or 6 pounds, you regulate that? You, yourself, regulate that

by reference to that motor that makes the air pressure, do you not?

A Yes, we regulate that."

We conclude that the evidence was of probative force and value to support the various elements set out in Section 9a of Art. 1995, and that the servant of appellant acting within the scope of his employment committed an act of negligence in Bell County, Texas proximately causing injuries to the plaintiff.

Other points of error to the effect that plaintiff voluntarily exposed himself to danger may become an issue on the trial on the merits.

The judgment of the trial court is affirmed.

Affirmed.